# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 20, 2008 Session

## STATE OF TENNESSEE v. ALEX STEVINO PORTER

**Appeal from the Circuit Court for McMinn County**
**No. 05-240    Carroll Ross, Judge**

---

**No. E2007-01101-CCA-R3-CD - Filed December 10, 2008**

---

Appellant, Alex Porter, was found guilty by a McMinn County jury of first degree murder and sentenced to life in prison. After the denial of a motion for new trial, Appellant seeks the resolution of the following issues on appeal: (1) whether the evidence is sufficient to support the conviction; (2) whether the accomplice testimony was sufficiently corroborated; and (3) whether the trial court erred by excluding the testimony of Valerie Ware and Mary White at trial. After a review of the evidence, we determine that the evidence is sufficient to support the conviction, that the accomplice testimony was sufficiently corroborated, and that the trial court did not err by excluding the testimony of Valerie Ware. However, we determine that the trial court erred by excluding the testimony of Mary White but conclude that the error was harmless. Consequently, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J. and JOHN EVERETT WILLIAMS, J., joined.

Ashley L. Ownby, Cleveland, Tennessee, for the appellant, Alex Stevino Porter

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Richard A. Fisher, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

Around 10:00 p.m. on August 2, 2004, the Athens Police Department was dispatched to investigate a shooting at 608 Ingleside Drive. Upon their arrival, they discovered the body of Antonio Ware. He had been shot several times.

Appellant and several other individuals, including Cornell Perry Gunter, Clifton Omar Robinson, and Dustin Tyrone Witt were arrested and charged in connection with Mr. Ware's death. Appellant was later indicted by the McMinn County Grand Jury for first degree murder and conspiracy to commit first degree murder.

At trial, the following facts were established. On the night of August 2, Appellant asked Dustin Witt to drive him along with Kenneth Hammonds, Cornell Perry Gunter, and Clifton Omar Robinson to an area near the tennis courts at Tennessee Wesleyan College. When they arrived, everyone except Mr. Witt exited the car. The four men walked to Kim Arnwine's house. Mr. Witt parked the car in a nearby church parking lot and walked toward the house to join the others.

Ms. Arnwine testified that early in the day on August 2, she was with her children at Cook Park, an area notorious for drug activity. While they were at the park, she talked to Antonio Ware and Marvin Goodman, also known as "Smitty."

According to Ms. Arnwine, Mr. Ware and Smitty stopped by her house around 9:30 or 9:45 p.m. on that night. Antonio Ware was carrying a gun. When he entered the house, he placed it on the china cabinet. He appeared angry and stated that he was going to take care of some people in Athens at Cook Park. Smitty apparently tried to calm Mr. Ware down and even called someone on the telephone to help Mr. Ware take care of the "Athens Boys." Shortly after Mr. Ware and Smitty arrived at her house, Ms. Arnwine's brother called and asked if she had company. Appellant called her next, asking if he could come over and if she had company. Ms. Arnwine testified that she told Appellant he could come over "in a little while" when her company was "leaving." She did not mention to Appellant that Mr. Ware was her "company." Mr. Ware and Smitty left her house after about ten or fifteen minutes. A few seconds later, Ms. Arnwine heard gunfire. She huddled her children together and got on the floor. Smitty ran back into the house to tell her that something had happened to Antonio Ware. Ms. Arnwine called 911, then walked outside to see Mr. Ware's body lying on the ground.

After parking the car, Appellant, Mr. Gunter, and Mr. Robinson hid behind some bushes about thirty to forty feet away from Ms. Arnwine's house. According to Mr. Hammonds, it seemed like someone was going to get "beat up." Mr. Hammonds did not like the "body language" of the other men, so he decided to leave the area. Mr. Hammonds passed Mr. Witt as he was leaving. Mr. Witt and Appellant moved to an awning or shed at the back of the house. While there, Appellant

called Ms. Arnwine on his cell phone to ask if he could come over. Mr. Witt could hear Ms. Arnwine talking. She told Appellant that he could not come over at the moment because she had company. Appellant hung up the phone and, according to Mr. Witt, pulled out his gun and said he was "ready to give it to this mother f - - - er because he tried to rob my sister Mary not too long ago and I still haven't forgot [sic] about it." Mr. Witt decided to leave when Appellant pulled the gun out. Mr. Robinson remained in the bushes for about ten or fifteen minutes and then decided to leave.

While Mr. Witt was about to leave the area under the shed at the back of the house, he heard the door to Ms. Arnwine's house close and saw the victim and Marvin Goodman walk out of the house. Mr. Witt started walking toward the car. He turned around and saw Appellant crouch down and fire his weapon at the victim. Appellant was behind the victim at the time. Mr. Witt dropped his car keys. By the time he was able to locate the keys, Appellant and Mr. Gunter were running toward him. Mr. Gunter testified that he heard Appellant claim he was going to "handle this." Mr. Gunter also saw Appellant crouch down and shoot the victim as Mr. Ware walked toward the car. According to Mr. Gunter, there was no indication that Mr. Ware saw Appellant before the shooting occurred.

Appellant, Mr. Gunter, and Mr. Witt ran back to the car. They picked up Mr. Robinson later. Appellant had his weapon in his possession, and Mr. Robinson gave a revolver to Appellant. Mr. Gunter also gave his weapon to Appellant, who indicated that he was going to get rid of the pistols.

Detective Patrick Upton of the Athens Police Department arrived on the scene. He located one bullet in the gravel under Mr. Ware's head and several other shell casings that were 9mm and .380 caliber. From the placement of the body, Detective Upton opined that Mr. Ware "took a step and stumbled out and fell and then the last shot was to his head."

Van Sliger, who lived nearby at 504 Ingleside Drive, testified that he was awakened by six gunshots on August 2, 2004. When he looked out of the window, he saw three black males run around his garage, get into an older model white Oldsmobile or Buick, and drive away. Mr. Sliger got into his truck and drove to the scene of the shooting. He saw police officers there and saw Mr. Ware lying at the scene.

During the investigation, Detective Upton found an unloaded Skorpion 9mm handgun at Ms. Arnwine's residence under a cushion on the couch. There was also a clip located nearby that fit in the gun.

After his arrest, Appellant led the police to a wooded area in Etowah, where the police found burnt pieces of a 9mm Hi-Point semi-automatic and other burnt material in a hole about two feet deep. According to Detective Upton, the investigation revealed that Appellant was in possession of the Hi-Point 9mm on the night of Mr. Ware's death.

Dr. Amy McMaster performed the autopsy of Mr. Ware. He had gunshot wounds to his head, arm and "a gunshot wound to his chest that may represent a reentry wound from the arm, and a gunshot wound to his hip." The cause of death was multiple gunshot wounds. The shots went

through Mr. Ware's body from the right to the left and the shot to his head went from the back to the front and upward. Dr. McMaster stated that her findings concerning the shot to Mr. Ware's head were consistent with the shooter standing over Mr. Ware.

Agent Shelly Betts of the Tennessee Bureau of Investigation testified at trial as a firearms examiner. She examined three fired bullets, six fired cartridge cases, several unfired cartridges, two revolvers, one pistol and firearms that had been destroyed with some sort of torch. According to Agent Betts, the three fired bullets all had nine grooves on the rifling with a left-hand twist. This rifling is commonly used by Hi-Point Firearms. One of the bullets was a 9mm and the other two were .380 caliber. The two .380 bullets were fired from the same weapon. Agent Betts stated that the 9mm bullet had the same rifling characteristics as the other two bullets, but the 9mm bullet did not have "sufficient individualizing characteristics" remaining for her to conclusively state that it was also fired from the same weapon.

Of the six fired cartridge cases, three of the cases were .380 cases and three of the cases were 9mm cases. According to Agent Betts, all six cases were fired from the same weapon, probably a 9mm pistol. Agent Betts identified the parts from the destroyed gun as parts from a Hi-Point Model C 9mm pistol. She was unable to determine if the cartridges were fired from the destroyed weapon.

At the conclusion of the jury trial, the jury found Appellant guilty of first degree murder. As a result he was sentenced to life in prison. On appeal, the following issues are presented for our review: (1) whether the evidence is sufficient to support the conviction; (2) whether the accomplice testimony was sufficiently corroborated; and (3) whether the trial court erred by excluding the testimony of Valerie Ware and Mary White at trial.

*Analysis*

First, Appellant claims that the proof is not sufficient to sustain a conviction for first degree murder. Specifically, he contends that the evidence would have allowed the jury to conclude that Mr. Ware was shot from at least two different guns, and there was no scientific or physical evidence linking him to the murder in this case. Further, Appellant argues that the physical proof showed that he was incapable of committing the murder because he was supposed to be crouched under the shed, not on the side of the building where the shooting began. Appellant also contends that there was no corroboration of the accomplice testimony admitted by Mr. Gunter, Mr. Robinson, Mr. Witt. Appellant also contends that the trial court improperly denied the motion for judgment of acquittal. The State disagrees, arguing that the evidence is sufficient to support the conviction.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the

burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Because Appellant challenges the sufficiency of the evidence on the basis that the accomplice testimony was not corroborated, we also note that convictions may not be based solely upon the uncorroborated testimony of accomplices. *See State v. Robinson*, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such testimony. *See State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). More specifically, precedent provides that:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must[,] of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

*State v. Griffis*, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (quoting *Sherrill v. State*, 321 S.W.2d 811, 815 (Tenn. 1959)). In addition, our courts have stated that:

> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

*Griffis*, 964 S.W.2d at 589 (footnotes omitted). Furthermore, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. *See id.* at 588; *State v. Maddox*, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997).

Keeping those guidelines in mind, in the case herein Appellant was convicted of first degree murder. First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Premeditation requires that the intent to kill is formed prior to the act itself. T.C.A. § 39-13-202(d).

> It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* The existence of premeditation is a question of fact to be determined by the jury from all of the circumstances. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Therefore, in order to convict Appellant of his indicted offense, the State was required to prove beyond a reasonable doubt that the defendant killed Mr. Ware with "premeditation." Some relevant factors that tend to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threat or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; the defendant's calmness immediately after the killing," and evidence that the victim was retreating or attempting to escape when killed. *Id.*; *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *see also State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992). The fact that repeated blows, or shots, were inflicted on the victim is not sufficient, by itself, to establish first-degree murder. *State v. Brown*, 836 S.W.2d 530, 542 (Tenn. 1992).

Looking at the evidence in a light most favorable to the State, the evidence showed that prior to Mr. Ware's shooting death, Appellant made statements indicating his anger toward Mr. Ware. Appellant commented that he was mad at Mr. Ware because he had tried to rob Appellant's sister Mary, and he wanted to confront Mr. Ware. On the day of the incident, Appellant was driven by Dustin Witt to an area behind the tennis courts at Tennessee Wesleyan College at Appellant's request. Appellant was accompanied by Kenneth Hammonds, Perry Gunter, and Omar Robinson. When they arrived, the four men got out of the car and walked toward Ingleside Avenue to Ms. Arnwine's house. Mr. Witt parked the car in a church parking lot and later joined the others outside Ms. Arnwine's house. According to the testimony at trial, Appellant along with Mr. Gunter and Mr. Robinson hid behind some bushes outside the house. At some point, Mr. Hammonds left the scene because he did not like the "body language" that he saw. Appellant and Mr. Witt moved to the back of the house by a shed. Mr. Witt testified that he heard Appellant call Ms. Arnwine on the telephone and ask her if he could visit. She told him that she had company. Appellant pulled out his gun and told Mr. Witt that he was "getting ready to give it to this mother f----- because he tried to rob my sister Mary not too long ago and I still haven't forgot [sic] about it." Mr. Gunter also heard Appellant say that he was going to "handle" Mr. Ware. Mr. Ware walked out of Ms. Arnwine's house. Appellant crouched down and shot Mr. Ware. There was no evidence entered at trial that indicated that Mr. Ware was brandishing a weapon at the time, even though he was seen with a gun at Ms. Arnwine's house earlier.

-6-

After Mr. Ware was shot, Appellant, Mr. Witt, and Mr. Gunter ran back to the car and drove away. Appellant still had his weapon. They picked up Mr. Robinson a bit later. When Mr. Robinson joined the men, he gave a revolver to Appellant. Appellant told the men he was going to get rid of the guns. Appellant later led authorities to a remote location in Etowah, Tennessee where they found pieces to a revolver, a 9 mm Hi-Point semi-automatic, and other material in a hole. The weapons appeared to have been melted.

All of the bullets removed from the victim's body had nine grooves on the rifling with a left hand twist, consistent with Hi-Point Firearms. Three of the bullets recovered from the scene were .380 caliber and three of the bullets were 9mm. Agent Betts determined that all six bullets were fired from the same weapon, most likely a 9mm pistol.

Appellant argues that the inconsistencies in the evidence presented by the State resulted in insufficient evidence to support the conviction for first degree murder. Whether the State established premeditation was primarily a jury question and based in this case on the credibility of the witnesses. Again, questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not an appellate court. *State v. Morris*, 24 S.W.3d 788, 795 (Tenn. 2000). Further, while the fact that repeated blows were inflicted on the victim is not sufficient, by itself, to establish first-degree murder, *see Brown*, 836 S.W.2d at 542, it is still a consideration. The proof indicated that Mr. Ware was shot multiple times from the same weapon.

As far as corroboration of the accomplice testimony, the testimony of Mr. Gunter, Mr. Robinson, and Mr. Witt was substantially similar. They all placed Appellant at the scene with a gun after hearing Appellant state that he had some type of problem with Mr. Ware. Both Mr. Gunter and Mr. Witt saw Appellant crouch down and shoot Mr. Ware. Their testimony was sufficiently corroborated by Mr. Hammonds, who was not charged in connection with the murder. Mr. Hammonds rode with the men to the scene of the incident and placed Appellant at the scene of the murder, but he left the area when he became nervous that someone was going to get "beat up." The testimony of the accomplices was also corroborated by the testimony of Ms. Arnwine. She confirmed that Mr. Ware visited her at her home. While Mr. Ware was there, she received a call from Appellant asking if she had company. Appellant asked her if he could come to her home. She told him that he could come over when the company left, in a "little while." A few minutes later, she heard gunshots. Further, Van Sliger, a resident of the area who was not involved in the incident, testified that he was awakened by six gun shots and saw three black males run around his garage got into an older model white Oldsmobile or Buick. Finally, Appellant's own actions in leading police to a cache of destroyed weapons in connection with the investigation also corroborates the accomplices' testimony. After a review of the evidence, we determine that the accomplice testimony was sufficiently corroborated and that the evidence was sufficient to support the jury's verdict of first degree murder.

In a related argument, Appellant argues that the trial court erred in denying the motion for judgment of acquittal at the close of the State's proof. This Court has noted that "[i]n dealing with a motion for judgment of acquittal, unlike a motion for a new trial, the trial judge is concerned only

with the legal sufficiency of the evidence and not with the weight of the evidence." *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). Because we have already determined that the evidence was sufficient to support Appellant's conviction, we conclude that the trial court did not err in denying the motion for judgment of acquittal.

### *Exclusion of Testimony of Mary White and Valerie Ware*

Next, Appellant contends that the trial court erred by excluding the testimony of Mary White and Valerie Ware. Appellant argues that the trial court's error violated his Sixth Amendment right to confrontation and his right provided under article one, section nine of the Tennessee Constitution to call witnesses on his own behalf and prepare a defense. Appellant sought to offer the testimony of Mary White and Valerie Ware to rebut the motive for murder that was advanced by the State at trial. The State counters that the trial court properly excluded the testimony.

At trial, Appellant sought to admit the testimony of Mary White, the defendant's sister. The State objected to the introduction of the testimony. In a jury-out hearing, Appellant proffered the testimony to preserve it for the record on appeal. During that hearing, Ms. White testified that she met Mr. Ware when he was incarcerated at Mountain City Correctional Facility with one of her brothers and another relative. Ms. White befriended Valerie Ware, Mr. Ware's wife. Ms. White claimed that at some point after Mr. Ware was released from prison, Mrs. Ware called her and told her that Mr. Ware was "going to have [her], or have someone robbed and killed." This conversation occurred approximately seven or eight years prior to Mr. Ware's murder. Ms. White was embarrassed by the situation because she had been told by relatives to stay away from Mr. Ware because he had a reputation for "robbing and killing people." Ms. White was never robbed, but she later told her friend Kimberly Hammonds about the threat.

After hearing the proposed testimony, the trial court ruled that it was not admissible because it was "hearsay on hearsay." The trial court also found it important that the statements took place so long prior to the incident at issue at trial. Specifically, the trial court determined:

> You have got proof on the record and she's very clear that she heard someone say they heard someone else say something, who happened to be [the victim] seven or eight years ago that said they might do something to her or to someone else. That's about as tenuous as I could ever conceive of this kind of evidence, and I don't fault her for being concerned at the time.

Appellant also sought to introduce the testimony of Valerie Ware, the victim's wife, to corroborate the testimony of Ms. White. Mrs. Ware testified that about seven or eight years ago, she told Ms. White that Mr. Ware might be in the process of doing something to her. Mrs. Ware testified, "When I told her and I can say about my husband was angry at the time about something

that was going on and it doesn't pertain to this right here, . . . ." Mrs. Ware stated that nothing ever occurred and that, after the fact, Mr. Ware actually spoke with Ms. White so it was not a "big deal." As to Mrs. Ware's testimony, the trial court determined that it was not relevant because the conversation occurred seven or eight years earlier.

To be admissible, evidence must satisfy the threshold determination of relevance mandated by Tennessee Rule of Evidence 401. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

A statement is hearsay if "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). For a hearsay statement to be admissible, it must fall within the hearsay exceptions provided by Rule 803 of the Tennessee Rules of Evidence.

With regard to Ms. White's testimony, if it was offered to prove its truth, i.e. that Appellant was planning to rob or kill her, then it is hearsay. Moreover, it is difficult to understand how this evidence would assist Appellant's defense because its truth tends to prove the State's motive for the Appellant having killed Mr. Ware. Likewise, even if not hearsay, and Ms. White's testimony was offered to show the effect of Mrs. Ware's information on the listener, Ms. White, the evidence would tend to promote the State's theory that Appellant at least believed Mr. Ware had threatened to rob Ms. White. Under either theory of admission, we believe it was not error to exclude Ms. White's testimony as to what Mrs. Ware told her.

Mrs. Ware's testimony as to her husband's threat to rob Ms. White is likewise inadmissible if communicated to Mrs. Ware by the victim and was being offered for the truth of the threats. Although not hearsay, if Mrs. Ware's testimony was offered to show merely that the threats were relayed to Ms. White, it is again difficult to comprehend the relevance to Appellant's defense.

However, both Mrs. Ware and Ms. White apparently knew first hand that Mr. Ware had in fact never attempted to rob Ms. White. This was not hearsay and was relevant to impeach the State's theory of Appellant's motive by showing that Appellant had no reason to be angry with Mr. Ware for trying to rob Appellant's sister, Ms. White. We believe this portion of Ms. White's and Mrs. Ware's testimony was erroneously excluded. However, we conclude this exclusion was harmless error as defined in Tennessee Rule of Criminal Procedure 52(a).

The testimony indicated that Appellant called Ms. Arnwine to see if she had company and essentially staked out the residence waiting for Mr. Ware to exit. When Mr. Ware exited the residence, Appellant crouched down and shot him multiple times. The theory of motive advanced by the State certainly bolstered the facts to support the first degree murder conviction. However,

we do not feel that the exclusion of the testimony of Mrs. Ware and Ms.White that the victim had never attempted to rob Ms. White would have swayed the jury and resulted in a different verdict.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE